No. 23,748.

MRS. B. C. WINKLER et al., *Appellants*, v. MARY KORZUSZKIEWICZ [*Shusky*] et al., *Appellees.*

### SYLLABUS BY THE COURT.

1. ACTION TO SET ASIDE DEEDS—*No Jury Trial as Matter of Right.* In an action brought by a part of the heirs of an intestate claiming an interest in land to which he had executed deeds, on the ground that they were obtained by fraud and duress while he was of weak mind, and should be set aside or the title thereunder impressed with a trust in their favor, the plaintiffs are not entitled to a jury although their petition asks for possession and partition and contains all the allegations essential in ejectment.

2. SAME—*No Fiduciary Relation Shown to Exist Between Grantor and Grantees—Deed of Gift.* It is held that a fiduciary relation such as to create a presumption of undue influence in the execution of a deed of gift by a parent to a daughter is not conclusively proved by the established facts of this case, which include these: The father was eighty years old, but in rare good health for that age, possessed of full mental vigor. He lived alone at some distance from the grantee, who visited him at considerable intervals. The grantee, with other children, claimed to be identified with her in interest, occupied the farm, which was the property conveyed, as tenants for a crop rent, marketing the father's share for him.

3. SAME—*Findings of No Want of Capacity in Grantor, or Undue Influence Exercised—Construed.* In an action to set aside a deed, findings that there was no evidence of want of capacity in the grantor or of undue influence exercised upon him are held not necessarily to mean that literally no evidence had been introduced tending to show such conditions, but to have the same effect as a finding against the plaintiff on these issues—as a decision that the allegations of the existence of such conditions had not been proved.

4. SAME—*Evidence—Letter by Daughter of Grantor.* A letter written by a daughter to whom the father had deeded land, to a sister, for the apparent purpose of leading her to believe that her participation in her father's estate would depend upon her conduct, is held not to prove the existence of a fiduciary relation, or the exercise of undue influence, or the assumption of an obligation to hold in trust the land conveyed to her.

5. SAME—*Motion for New Trial—Properly Denied.* Newly discovered evidence produced by affidavit after the trial, apart from the question of diligence, is held not to require the granting by this court of the motion for a new trial.

Appeal from Stafford district court; DANIEL A. BANTA, judge. Opinion filed December 9, 1922. Affirmed.

*F. L. Martin, John M. Martin, James N. Farley,* all of Hutchinson, and *Ray H. Beals,* of St. John, for the appellants.

Winkler v. Korzuszkiewicz (Shusky).

*Sam Jones, Ben Jones,* both of Lyons, and *F. Dumont Smith,* of Hutchinson, for the appellees.

The opinion of the court was delivered by

Mason, J.:    Kasmir Korzuszkiewicz (whose family name appears to be pronounced Shusky, and is sometimes written in that way) died May 24, 1920, survived by nine children. On November 6, 1917, he had executed to his son Nicodemus a deed to a quarter section of land, reserving a life interest. On November 5, 1918, Nicodemus executed a quitclaim for this tract to his sister Mary. On November 8, 1918, Kasmir executed to Mary two deeds covering four additional quarters, and a bill of sale for 54 head of cattle, she signing an agreement to give him one-third the crops on the land during his life. On July 8, 1920, this action was brought against Mary, Nicodemus and three other children, Martha, Felix and John, by the remaining four children, Tim, Mrs. B. C. Winkler, Mrs. Lizzie Tookert and Mrs. Lena Zorn, alleging among other things that the deeds and bill of sale referred to were obtained by Mary from their father, who was of weak mind, by false pretenses, coercion and duress and under a promise to him that she would distribute the property equally among all the children. The plaintiffs claimed, and asked to recover, four-ninths of the land. A trial resulted in a judgment for the defendants, and the plaintiffs appeal.

1. The plaintiffs complain of the refusal of their demand for a jury. The original petition merely alleged that their father died intestate owning the land, that the plaintiffs as heirs owned each a one-ninth interest in it, and that the defendants unlawfully kept them out of possession. Doubtless because of the requirement of the present code (§ 619) that in ejectment if the claim is based upon an equitable title the facts upon which it is founded must be pleaded, an amended petition was filed setting out the execution of the deeds referred to and alleging their invalidity upon the grounds already stated. The situation is the familiar one in which the petition contains the allegations essential in ejectment but discloses that the defendants hold the legal title by deeds the effect of which must be nullified or modified by the interposition of a court of equity before the plaintiffs can be entitled to any relief, and the action is therefore an equitable one in which a jury is not a matter of right. If the case had come to trial under the original petition, doubtless upon the face of the pleadings the plaintiffs would have

been entitled to have a jury impaneled, but as soon as the character of their claim was developed by the evidence the court would have been authorized to discharge it. The amended petition discloses that the actual purpose of the suit is to have the deeds set aside or the title under them impressed with a trust in favor of the defendants, and that therefore the controversy was one to be determined without a jury. In the opinion in a similar case the fact was mentioned that some of the familiar characteristics of a petition in ejectment were wanting, but any inference that the insertion of the omitted allegations would have justified the demand for a jury was conclusively negatived by the following language:

"The plaintiffs' right to possession and enjoyment of the land as owners depended on their right to have the deed canceled. What they desired was the verdict of a jury on their right to cancellation. That was a subject of equitable cognizance, and the request for a jury trial as in an action at law was properly denied. . . . The facts stated in the petition did not disclose an equitable title. They disclosed a legal title, derived by operation of the statute of descents and distribution, enjoyment of which was frustrated by a deed procured by undue influence exercised over the mind of their ancestor. The purpose was not to settle disputed claims of heirship, but to remove an impediment to the enjoyment of inherited property. While the answer contained a general denial, and so as a matter of form put in issue the capacity of the plaintiffs to challenge the deed, the substantive issue was the voidable character of the deed, and the right to invoke the equitable remedy of cancellation. If the statutory form of petition in ejectment had been used, and a jury had been called on the theory the action was one at law, no doubt the court, when the statement of the case or the production of evidence disclosed the true equitable nature of the suit, would have exercised the power to determine the controversy for itself, as the court did in the replevin action under review in the case of *Akins v. Holmes,* 89 Kan. 812, 133 Pac. 849." (*Houston v. Goemann,* 99 Kan. 438, 441, 442, 162 Pac. 271.)

In another case, where the plaintiffs sought to have a trust imposed upon real estate, it was said that if the action had been merely to recover possession it would have been in the form of ejectment. But, as the context appears sufficiently to show, no suggestion was intended that by ingrafting the allegations characteristic of ejectment upon a petition setting out an equitable cause of action its essential nature would be so changed that a jury trial would be a matter of right. (*Rayl v. Brown,* 108 Kan. 385, 195 Pac. 611.)

2. The deeds were without valuable consideration, and the plaintiffs contend that it was conclusively shown that the grantees occupied a fiduciary relation toward their father, and therefore a pre-

sumption of undue influence, coercion and fraud arose, which the defendants were required to overcome by affirmative evidence. Such a presumption does not arise from the mere relation of parent and child. (*Clester v. Clester*, 90 Kan. 638, 135 Pac. 996.) At the time the deeds were executed the grantor was living alone at Ellinwood and the defendants occupied the land conveyed to Mary, situated some twenty miles south of there, as tenants, paying a crop rent, and looked after the stock on the place belonging to their father for a share of the increase. They marketed his share of the crops. They went to see him at considerable intervals. These conditions continued for several years. We do not regard these circumstances as resulting in such fiduciary relationship as to create a presumption of bad faith or undue influence in connection with the making of the deeds. Nor in our judgment is there anything in the admissions and undisputed facts having that effect. A letter written by Mary and urged by the plaintiffs as having an important bearing on this matter will be referred to later. The father of the parties was about eighty years old at the time of his death. The court found that "for a man of his age and the strenuous life he had lived, he was in rare good health and physical condition, and he himself made infrequent visits to his children on the farm and to Mrs. Winkler at Hutchinson, and up to within a few hours of his death he was possessed of full mental vigor, fully capable of understanding his surroundings and condition and of what disposition had been made of his property."

3. In the course of the detailed findings of fact it was said that there was no evidence of want of mental capacity on the part of the grantor or of any undue influence, false statements, threats, coercion or duress on the part of the defendants, or of any promises by Mary to recover or hold the property in trust. The plaintiffs interpret these findings as meaning literally that no evidence was introduced having any tendency to support their allegations in relation to these matters—as indicating the same attitude of the court as though a demurrer to the evidence had been sustained. We regard them, however, as merely having the effect of a determination against the plaintiffs on these issues—deciding that the allegations of the petition were not proved. In the findings of juries, statements that there was no evidence of a fact have been held to mean that there was "no persuasive evidence, no preponderance of the evidence (*Jolliff v. Railway Co.*, 88 Kan. 758, 760, 129

Pac. 1178)—"that under all the evidence the jury were not satisfied that such was the case." (*Burks v. Railway Co.*, 83 Kan. 144, 109 Pac. 1087.)

4. This correspondence took place between Mary Shusky and Mrs. Winkler, at the dates indicated:

*"Dear sister Bobena:*          "STAFFORD KANSAS September 24th 1918.

"I will take the pleasure this lovely fall morning and write you a few line in regard of business concerning pa. Now you remember while you were at Ellinwood & we were telling you we wanted higher wages and you said it wasent right fore us to colleck such wages & so on.

"Now we have not been there sence that time as we said we want all you to go and doe the work fore pa's. Now I am writing this letter to you & you & Lena & the rest must go & see after pa & see his house is clean & that his horses & everything if you dont go & doe it your mouths are close.

"Now we haven't never charge one red cent. but if you all wont doe it we will set our price & you all doe without.

"Now his house hesent ben cleaned his clothes seen to sence we were there in the early spring.

"Now those that clame their selfs children to that old man doe your part as John Martha & myself have done & all will be dealed even.

"Otherwise you all must be satisfied if you dont get nothing. Some one must go once a month during the winter fore he is old he is all your children father as well as he is mine.

"Give me a ans. if you will go ore if you wont go & you ask Lena if she will doe the work fore pa fore nothing as we heve so it will be dealed even otherwise it wont.

"Give me a answer at once so I can make arrangements.

                                                    "MARY SHUSKY."

*"Dear Sister*          "HUTCHINSON KAN Sept. 26. 1918.

"I was very much surprised to have you write me such a letter and will answer it right back. I am willing to go over and take care of father now and you keep your mouth shut from now on. I went over and saw the Judge and he tells me I can collect wages if I, wish what ever I think reasonable and the children that wont take their share of taking care of father must pay the one that does.

"Either you or John come over soon and let me talk to you & know how things are going to be. You forget sister—that I took care of you both—when you were little and did not ask pay as you want to take care of your father. You can write to Lena yourself I wont What do you mean by setting your price and the rest do without explain if you can soe I goed to clean the cettle today I goed to father to more and take care of him and I have is the back to more soe good bye to all of and write to me soe and say come to see me and it is nice to day.                    "BALBENA WINKLER."

The plaintiffs contend that Mary's letter shows conclusively that she occupied a fiduciary relation with respect to her father, that

she exercised undue influence over him, and that she assumed an obligation to see that his property was equally divided among all the children. We are unable to give it these effects. It seems possible that what was said about all being "dealed even" may have meant merely that, inasmuch as Mary and Martha had rendered services for their father without charge, if Balbena and Lena did the same this would result in equal or even dealing—otherwise it would not: "doe your part as John Martha & myself have done and [then] all will be dealed even;" "ask Lena if she will doe the work fore pa fore nothing as we have so it will be dealed even otherwise it wont." Balbena herself did not know what Mary meant by saying—"Now we haven't never charge one red cent. but if you all wont doe it we will set our price & you all doe without." It may have meant that the price would be the whole estate, leaving nothing for the other children, or it may possibly have meant that if the services were to be paid for at all Mary and Martha would perform them and get the whole amount paid and Balbena and Lena would get none of it. We will assume, however, that Mary's purpose in writing the letter was to lead her sister to believe that the participation of Balbena and Lena in their father's estate would depend upon whether they assisted in caring for him without pay. The fact that she undertook to foretell what her father would do with his property is not proof of her having power to control the matter, and the letter was written more than a month before the deeds to her brother and herself were made. Even if this sisterly interchange of letters could otherwise be given effect as a contract it will be noted that the equal distribution of the property was promised or prophesied upon the basis of the work in caring for the father being done for nothing, while the answer clearly contemplated a charge for the services to be rendered.

5. The motion for a new trial included newly discovered evidence as one of the grounds. Affidavits were filed tending to show that grain on the farm, conceded by the defendants' attorney in May, 1921, to belong to the estate of their father, was not turned over to the administrator; that no personal property was listed in the father's name for March 1, 1920, but corn and wheat were listed by several of the defendants; that Mary had testified in the probate court that her father lived on the rent of the farm and that she did not know how it was all accounted for and did not know of any property or money that he had around the farm; and that an at-

Nangle v. Packing Co.

torney of two of the plaintiffs, accompanied by them, called upon the defendants for information concerning property of the estate, Mary denying that there was any and the others refusing to answer questions, in response (according to the affidavit of Mrs. Tim Shusky) to a signal from Mary made by placing her fingers on her lips. It is not shown that due diligence was used to obtain this evidence at the trial. The district court obviously did not regard it as requiring a reopening of the case—as likely, if admitted, to change the result—and we see no sufficient ground for interfering with its disposition of the matter.

In view of the general and special findings in favor of the defendants we deem a further discussion of the evidence unnecessary. The discrimination on the part of the father between his children is extreme and striking, but the distribution of his property among them was a matter in which his discretion was absolute, and we find no ground for disturbing the decision of the district court.

The judgment is affirmed.